I understand you have a motion, Mr. Fitzpatrick. I do, your honors. If the law clerks would come up. I'm pleased to appear before you this morning to move the admission of Nadia Abrahamsen, who is a staff attorney. She did her undergraduate at McGill. Her law school degree is from Williams and Mary and she's admitted to practice in the state of New York and in Florida. Brian Cortazar is a law clerk to Judge Hamilton. He's admitted to practice in Illinois and he has his undergraduate and his law school degrees from Harvard. Libby Deshaies is a law clerk to Judge Kaney. Her undergraduate degree is from American University. She's a graduate of the University of Illinois. She's admitted to practice in the state of Illinois. Matt Durkin has his undergraduate degree from Notre Dame. His law school degree is from Loyola. He's admitted to practice in Illinois and he's a clerk for Judge Bauer. Riley Floyd is a clerk to Judge Hamilton. His undergraduate degree is from Wabash. His law school degree is from Indiana University Mauer School of Law and he's admitted to practice in the state of Indiana. Kayla Higgins is a staff attorney who's admitted to practice in the state of Illinois. Her undergraduate degree is at the University of Chicago. Her law school degree is from Chicago-Kent. Michelle Raven is a clerk to Chief Judge Wood. She's admitted to practice in Illinois, Indiana and Florida. Her undergraduate degree is from the University of Florida. Her law school degree is DePaul. Kelsey Van Overloop is a staff attorney whose undergraduate degree is from the University of Michigan. Her law school degree is from the University of Michigan and she's admitted to practice in the state of New York. Your Honors, I move their admission. Seeing no objection, I am happy to grant your motion and I welcome all of you to the bar of this court. We appreciate the service that you have given us thus far and we look forward to many more years of seeing you in our courtroom. So you may now turn and take the oath. Congratulations. We are now ready to hear our case for this morning. Brandon Dassey against Michael Dittman. And we will begin with Mr. Berg. And Mr. Berg, I have to tell you that unfortunately the General Services Administration turned the power off in this building over the weekend and they couldn't get the podium lights to work this morning. So we will have cards, I think the old fashioned way. I'd be glad to remind you when you get to your rebuttal time if you would like me to do that. I would appreciate that. Certainly. So you may proceed. Good morning and may it please the court. Brandon Dassey confessed because his guilt became unbearable. What he and Avery did to Teresa was horrific. What happened to Teresa was certainly horrific but isn't the issue before, well there are two issues before us as I take it. One is whether the confession that you have put together from the various things that Dassey said was from a constitutional point of view voluntary or to put it more accurately whether the state court determination that it was voluntary was a reasonable assessment. And secondly the effectiveness of counsel that he received from Mr. Kaczynski who was representing the victim's family it seems. So no one questions the terrible nature of this murder. How could you? But whether Mr. Dassey was responsible for it or whether he just went after the fire was lit is a serious question. Absolutely. The investigators just nudged the confession out of Dassey. They took numerous precautions to protect against Dassey. What was Mr. Dassey's IQ? His most recent IQ test was 83 or 81 at trial. There was some evidence that it was 74. That was when he was 7 years old. The next test he took was 76. The next one was 78. And the most recent test when he was 16 or 17 was 83. And he was 16 when he was being questioned by the officers? That's right. He was 16 years old. Of limited intelligence. And the fact that he was 16 years old, what I'd like to ask you Mr. Berg is how was the state appellate court's analysis any different than an analysis that would be applied to an adult with ordinary intellectual capabilities? The court of appeals mentioned Dassey's age. They mentioned Dassey's mental capabilities. They quoted the test. Well if it's true that a state court analysis can be that cursory or give no reason at all with just mentioning his age. And because his age, as Judge Rovner is pointing out, there's supposed to be special care given to his age in terms of the analysis. And so where can you point me to in a decision where we can see that his age was given special care other than the passing reference? The idea that the Wisconsin Court of Appeals failed to consider a factor that it took care to mention two paragraphs before its analysis strains credulity. That's almost a direct quote from the Supreme Court in early V. Packer. The Ninth Circuit reversed a conviction on the theory that the state court hadn't considered a factor that the Ninth Circuit had mentioned in its fact section. Look what they did basically was merely mention his age and his low IQ. Is that sufficient care and caution? Where was the application of the special care standard? The court quoted the standard directly from the Supreme Court. It stated it, but how did it approach it? It went through what it considered to be all of the relevant factors. It mentioned them briefly, that's true, but that is the state court's prerogative. Courts of Appeals frequently do that. Isn't it also correct, Mr. Berg, that the state court cited other state court opinions which elaborated on that standard in particular in juvenile cases in much more detail? That's exactly right. And the Wisconsin Court of Appeals also said that it was basing its finding on the trial court's opinion. And the trial court was much more thorough. It went through all of the relevant factors thoroughly. So this idea that it failed to actually consider the totality of the circumstances is outlandish, quite frankly. Well, no, it's not outlandish at all. This case is very much like Brumfield against Kane from the Supreme Court where somebody with a great number of limitations is pressured. And a person with a literal cast of mind being told, if you tell us the truth, the truth will make you free, a rather biblical allusion, of course, we know. And being told as many times as Dassey was, if you just work with us, everything will be fine, leading up to saying, can I go to my sixth period class, suggests that there were false promises of lenience. As we argued in our brief, courts have consistently held that there has to be a very specific offer for there to be a false promise of leniency. That's for a competent adult. I think this is where we're intersecting with the youth and the mental limitations, I'll just call it that. There's plenty of evidence whether he's in the bottom 5 percent or the bottom 8 percent, whatever. But I believe that the standards that you're referring to are the reasonable adult standard. And the court has said in other cases that juveniles are not adults. Juveniles need a different test. Absolutely, that's right. But it's a totality of the circumstances test. Even here, the totality of circumstances show he was told at least 28 times during the interview that everything was okay, that they already knew the truth and it wasn't his fault. 28 times. They also took numerous precautions to protect against Dassey misunderstanding anything they said. Could you tell us what precautions they took? Absolutely. They began the very first interview by telling Dassey, you can leave at any time and you don't have to answer any of our questions. Could I just ask, because you mentioned the first interview, when we think of the totality of his interactions with the police officers, he sees these same officers on a couple of occasions. He sees twice, I believe it's the February 27th interview, then the March 1st interview. Shouldn't we evaluate his interactions with them on the basis of all of that, if we're really doing the totality? Absolutely. So if Officer Fassender makes a promise of lenience in even one of the earlier ones, that's a problem. I think that would be relevant, yes. So in that February 27th, they actually said they were not acting as officers, but instead as fathers. So doesn't that confuse their roles and imply leniency to an intellectually or emotionally limited juvenile? No. Why not? As I said, they warned Dassey, he can leave at any time and anything he said can be used against him. They repeated that warning throughout. At the end of that first interview, after making multiple... So the fact that they said they were acting as if they were his father, that doesn't have any bearing on it. It's a factor, certainly, but it doesn't force the conclusion that his confession was involuntary. Is it correct that Dassey told the police officers during the course of these interviews that his uncle had told him not to talk to the police? Yes, that's right. I've forgotten the role that Avery's lawyer played in that, but that was one of his accounts. Is that right? Yes, that's right. I also want to point out that at the end of the very first interview, after making multiple vague assurances very similar to the ones they made on March 1st, the officers asked Dassey specifically. They said, did we make you any promises? Dassey said, yes, that I could leave whenever I wanted and I didn't have to answer any of your questions. I think that's pretty strong evidence that he didn't hear any promises from their sort of vague statements. How do we take the, can I go back to school? I mean, the kinds of things that they were eliciting from him with quite a bit of work, as Judge Rovner's opinion certainly amply documented, most people who commit murder, dismemberment, and destruction of a corpse don't think they're just going to go back to school and turn in their sixth period project. Most people, if they saw what Dassey saw, wouldn't have participated. Well, but I'm just saying, doesn't that tell you that he is just a person who doesn't get it? They told him, if you talk to us, everything is going to be fine. We have your back. We're your father. Promises are made. I think those statements show at most that Dassey doesn't understand how awful it is to rape and murder someone. Was he aware that his mother said it was all right for him to talk to you? Absolutely. The officers asked both his mother and him for permission. They offered to let her sit in on the second interview. Both he and her declined. For the March 1st interview, they again asked both him and his mother for permission. They Mirandized him. Multiple times. In the second interview, they Mirandized him on the March 1st interview. They repeated those warnings before they started asking questions. Mr. Burke, what, if anything, should we make of the fact that in March of this year, one of the nation's largest police consulting firms, the one that trains officers in Chicago, New York, and federal agencies, has said that it's tossing out the Reed technique, the one that was used here, the interrogation technique used in this case, because of the high risk of false confessions. Do you take that into consideration at all? Barely. The Constitution does not incorporate what a particular organization thinks are best practices. And just because that one organization thinks they are best practices doesn't mean that they, in fact, are best practices. One institution that is now training the large city police forces and federal agencies. It's meaningless, right? It's one organization among many. And this is a case that has obviously garnered a lot of attention, so the fact that they used it to get some attention of their own, I think, should not be given a whole lot of weight. Can you speak of the fact that they did not feed him? I mean, think of the trying to get him to talk about that she was shot in the head. It's like a 20 questions game. I cut her hair. I slit her throat. You punched her. And finally he says, oh, come on, who shot her in the head? Over and over, the facts are given by the police officers to Dassey, and Dassey agrees with what they said. Until he goes out and talks to his mother and says, I didn't really do it. They got into my head. I'll give you two very important details. Two details that he provided that weren't even suggested by the question that was asked of him. So early on, Dassey said that Avery put Teresa in the back of the truck. They asked him, was she dead? And he said, yes. And they said, Dassey, how do you know that? At that point, he realizes that he's been caught in a lie. And quite logically, but unexpectedly, he says, well, I was biking and I could hear it. They're like, what? Hear what? Screaming. Screaming what? But there had been huge publicity about this case. There wasn't publicity about her screaming, help me. He knows that she's dead, right? As of the time of these two or three interviews. Everybody in the United States knows that she's dead by the time of these interviews. Yes, that's true. But he provided a lot of detail that he could not possibly have gotten from anywhere. I think the most telling examples are his memories of Teresa. He remembers her screaming, help me, and how she looked. Naked and chained up to the bed. He remembers her crying. But they feed him that. I mean, that's not something that initially. In fact, there are contradictions in his accounts. The contradictions are rife. They didn't feed him the fact that she was handcuffed to the bed. But there's no evidence that she was either. They found handcuffs in the bedroom. But does that mean, does that lead to this? Well, I will note that. Because they found handcuffs in the bedroom? I will note that the question of whether there was enough evidence is a question for the jury. Habeas is not a license for federal courts to play backup jury. Yeah, but when we try to evaluate whether it was voluntary and whether some of this information was new or fresh, we can look at the corroborating circumstances around it, can't we? And that can certainly have some bearing on it, on the question. No, I don't think you can. No, the Supreme Court has consistently said that reliability is a question for the jury. It's not something you consider on voluntariness. So there is a good answer. There's a lot of corroborating evidence in this case. But that's not something you consider in a habeas case. So here we have to think of the theory that we're operating under. There's some discussion in both the briefs and the district court opinion of both D1 and D2. And in a D2 case, you are, in fact, looking at the evidence. Which is why I mentioned earlier the Brumfield case, which is a square ruling by the Supreme Court of the United States relatively recently, finding an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. It's an Atkins claim, but it doesn't matter. It's a 2254 D2 claim. So I think we do have to look at the evidence here. But actually, I want you for a minute, if you just take two minutes of your argument time, to discuss the ineffectiveness of Mr. Kuczynski. Since the district court is obviously horrified by that. The state courts are horrified by his behavior. They remove him from the case. And he actually says at some point, I consider myself to be representing the victims. So why doesn't that fall within the Kyler against Sullivan conflict of interest rubric? What Kuczynski did is absolutely indefensible. We haven't defended it. So he's not representing his... It's as though his... It's worse than having no lawyer at all. He would have been better off pro se. He would have been better off with somebody who was not helping either the victim's family or the prosecution. He was removed eight months before trial. But the harm was done. The harm in the term... You use these confessions at the trial. The harm was already done by the time Kuczynski leaves. What he did had absolutely no effect on the primary confession, the March 1st confession. Kuczynski wasn't around until after the confession came in. So there's no arguable effect on the centerpiece evidence. But he doesn't do anything to try to ameliorate this, to try to bring a solid defense of involuntariness of the confession. That's absolutely not true. He moved to suppress the confession. And if you read the transcript, he made a lot of the same arguments that Dassey is now making on appeal. No, I've read the transcript, of course. He identified all of the same statements that Dassey has focused on. And he argued that it was coerced and the court rejected that. Of course, you don't have to show prejudice in a Kyler case. If you show conflicted counsel, counsel with an actual conflict of interest, you're done. The Sixth Amendment gives you the right to counsel. You have to show an adverse effect. Right. But regardless, the Kyler claim is foreclosed on habeas because the Supreme Court clearly said in Mickens that Kyler is only clearly established for multiple concurrent representation. Nothing like that happened. Well, and that's what I'm saying. And I don't see anything in Mickens that says the kind of conflicting concurrent representation has to be co-defendants. If he was essentially a member of the prosecution team, that's a party. That's a concurrent representation. There is no allegation that he had any relationship with the prosecution, that he had any sort of financial incentives. He made some bad decisions. Money doesn't matter. I mean, you can represent somebody without being compensated. Well, we think the Kyler claim is clearly foreclosed by Mickens. It's a very clear statement from the Supreme Court. In Mickens, the court was considering successive representation. So you had a lawyer that was representing two different people. That's very close to multiple concurrent representation. And yet even there, the Supreme Court said that Sullivan doesn't clearly establish anything in that. Here you don't have anything like either multiple or successive representation. You have some bad decisions by counsel, sure. Well, you have... I don't agree with that reading of Mickens, actually. So, because you do have active representation of conflicting interests. Well, our position is that it's clearly foreclosed. So I'd like to move back to the voluntariness if I could. As we've argued... And moving back to the voluntariness, when we look at the limitations Dassey had and his demeanor during the interviews, particularly when we look on the tape, you can see a significant change in his demeanor when he's left alone or when his mother enters the room. I think that actually supports the state's position here. So, at the end, if you watch the 20 minutes, re-watch the 20 minutes when his mother comes in. He spends 10 minutes. His mom is crying saying, why did you do it? Why did you keep it a secret? Why didn't you tell me? She says, you knew it was wrong, right? Looks like he nods. The whole time, he's got his head in his hands. He can't bring himself to look at her. And then when she leaves, he starts crying for the first time, the only time that I'm aware that he cries. And I think it's pretty clear that he's guilty. I think that's why he confessed, because he needed to get out all of those things that were in his mind. Now, I want to go back to the memories of Teresa that I was mentioning before, because I think that's one of the primary evidences that his confession was voluntary, the way he volunteered those details. He remembered her crying and pleading with him not to do it while he raped her. He remembered her desperately trying to move away as Avery came at her with a knife. He remembers her breathing after Avery stabbed her in the stomach and that she's still struggling to breathe. After he cut her throat, he remembers that her belly wasn't moving as they carried her out to the garage. And he remembered the awful smell as her body burned. None of those memories were suggested to him by the officers. They were very raw, and they were very real, and Dassey needed to get them out. Another main piece of evidence that shows the voluntariness is the way he resisted the officers numerous times. He's guessing. I mean, you see this as resistance. I see this as him sort of casting doubt. You see these long delays on the video where they ask him a question, and he's obviously racking his brain as to how can I answer this in a way that you're going to like. How can I answer this quote-unquote correctly? And, you know, I don't... His very diction is so unsophisticated. He just doesn't know what he's talking about. The counter to that is that you have at least 35 different times that he resists the officers' questions. So they asked him six different questions on four separate occasions about whether he shot Teresa. And these were some of the most leading questions. They said, we know you shot her, too. Isn't that right? He says, no. It never was in my hands. They asked 15 questions on six separate occasions about whether the fire was going when he got over there. He consistently said that it wasn't. He answers every which way on some of these questions, whether it's about the fire, whether it's about where's the car in the garage, did you go first, did you go later?  And you can pick a sentence here and a sentence there and knit together a confession, but that's exactly what you would expect for a traumatic memory like this. That's how memory works. And it's also what you would expect from somebody who is trying to say what the officers want to hear and isn't reading their mind. Particularly because they show his frustration when he resists or disagrees with key details, and then they offer him praise, saying, oh, now we believe you, when he picks up on a fact that they have suggested to him when he's answered. What you would expect if he truly had been coerced is that he would continue to resist the officers, and he did. There was eight questions in a row about whether they used the wires in the garage for anything. He never gave in to that. Why not? If he gave in to everything else, why would he not give in to something like that? He explains at one point because he just couldn't think of anything. He couldn't come up with another thing to say, and he's at the end of his rope a few times and he's at the end of his rope. So you're talking about the question who shot her in the head, and I think there's a very good explanation for why he couldn't think of it. Put yourselves in the investigator's shoes for a moment. They're trying to figure out what happened. They don't know the details. They know... Oh, but they're telling him, we know everything, Brendan. They know she was shot in the head, so they think that's how she died, and they're talking with Dancy about what happened in the bedroom, and then he says, Avery stabbed her. I cut her neck. Avery choked her, and they're thinking, well, she must be dead now, so why would Avery shoot a dead woman? That doesn't make any sense, so he must have shot her in the bedroom, and so they try and get to elicit that detail, and he can't think of it because his mind is in the bedroom. They don't find out until later that Avery actually shot her in the garage like 10 minutes later, and so that's why Dassy couldn't think of it in the moment because they haven't focused in the bedroom, and so there's a very good explanation for why he couldn't think of it. Which just goes to show all he's trying to do is figure out what's in their mind, how can I replicate what you're waiting to hear, and then you're going to praise me and say, good for you, you're going to feel better after this, and now we move on, and everything's going to be okay. We're in your corner, Brendan. That doesn't explain all of the details that he volunteers that were never suggested to him, and I'm not sure that all of the... I mean, we can discuss this with your opponents. I think that the list is, if not nonexistent, very short, and he explains at the trial that he's made up some of those, quote, details from a book he read. Yeah, I think that explanation is outlandish, quite frankly, especially because the detail that he's talking about, that Teresa was handcuffed to the bed, that came in response to a question that didn't even call for that detail, so they're walking him into the bedroom, and he says, well, she was handcuffed to the bed. The idea that he, at that moment, suddenly conjured up this book that he read, decided to make up a story and pull a detail from it, just beggars belief. Why? It's in fantasy land anyway, and there's no sign on the headboard of handcuffs. I mean, she could have been handcuffed. Or possibly he was remembering. He was in his mind, and he remembered the detail. He remembered vividly the image of Teresa handcuffed to the bed, and he remembers vividly the fact that she was alive. Nothing the investigators said came even close to a specific promise. The investigators made my skin crawl watching this video, this lulling behavior that they conveyed, which was so dishonest, so dishonest,  It was not what I would call an interrogation. It was a, you know, there was some minor deception, to be sure, but the cases say that that's okay. No, I don't think it was major. A lot of the things that the investigators actually said were true. Psychological coercion. A lot of the things that they told him were true. So their statements, we'll go to bat for you, for example. They did, in fact, go to bat for him. If he had stuck with his story and testified against Avery, I suspect they would have. That's exactly right. He would have stayed with us and he probably would have gotten a lot of credit if he had not recanted his confession. We may not even be here if he had. I doubt that. Just for your information, I think this white card means you're in rebuttal time. It's up to you. You can talk to us further or not. I'd like to save the remainder of my time for rebuttal. Thank you. Okay, certainly. So, Ms. Neureider, of course, your big issue is epidefference. Even if there's a lot that looks like any rational person might have said this was a limited person, the state courts found otherwise. What do we do about that? It did, Your Honor, and may it please the court. Deference, by definition, does not preclude relief. That is what we know. We know from the Supreme Court relief is reserved for cases where the application of clearly established law, even where that law is stated in general principles, has been unreasonably misapplied in the state courts, and that's precisely what we see here. Is your best argument stronger under 2254 D.1 or 2? Your Honor, I believe those two arguments are intertwined. I believe on both D.2 grounds and on D.1 grounds here, and the directive from the Supreme Court that dictates the results in this case was articulated in Miller v. Fenton, where the court said that involuntariness is not only concerned with inherently coercive techniques, but it equally encompasses techniques that are coercive only as applied to the unique characteristics of this particular case. I would argue that Miller, looking at the circumstances here, no threats, care for physical comforts, he's Mirandized, mother is invited to sit in and chooses not to. He says that's okay. Voices are not raised. To quote Miller, would you say that the police here use tactics, quote, so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the 14th Amendment? I would, Your Honor. And what are those? Those tactics include issuing a promise of leniency to Brendan Dassey. There was no promise of leniency. Not when judged by the standard of an adult. Even with an intellectually well-known assurances or promises, there has to be a concrete promise, fraudulent promise of leniency for it to bear on the voluntariness of the confession. Vague assurances are not enough. And certainly not under 2254D review. There was a very specific and concrete promise of leniency made in this case. Honesty will set you free is what they told him. Now, Your Honor, it is true, unquestionably true, that you and I would understand that to be a quote from the Book of John, an idiom. But the record in this case is indisputably clear that idioms are the one thing that Brendan Dassey cannot understand. He has no choice because of his disability. He understood plainly that he was being encouraged to be honest and to get it off his chest. And that the exchange for his talking was to be set free. He had no choice but to take those words literally. Is the key here his IQ? We accept the fact that he has a lower IQ. That's it? Anybody that has an IQ of that level can't be questioned the way he was? Certainly not, Your Honor. This is longstanding federal law and there have been many cases with many interrogations of mentally limited individuals that have come into evidence without any problem under Miller v. Fenton. This is a unique fact. This is not an aggressive questioning. It is a case of psychological coercion. There was a promise of leniency. In fact, there's case law that says they can bluff. They can bluff, Your Honor, but they cannot so distort his rational will that he was incapable of... That's because of his IQ? Because of his IQ, because of his disabilities, Your Honor. The IQ is part of the disabilities, but in particular his impairment's undisputed record that he was unable to process idioms. Combine that, that statement that honesty will set you free with the assurance... That's not true? I'm sorry? That's not true? That statement was not true, Your Honor. Certainly not, and you see him believing, of course, that it will be true because you see him expecting after confessing to rape and murder that he's going to go back to school, and even after the officers disabuse him of that notion, they say to him, Brendan, you know we're police officers, right? And because of what you said, the law won't let us let you go. He still clings to that illusion, and he says, is it only for one day? Even if they attempted to correct him, then it's still wrong. Honesty will not set him free. That's correct. Even if the police attempted to correct his misunderstanding, that doesn't do any good? They only attempted to correct that misunderstanding after he confessed. When they finally break the promise, and my colleague on the other side for the state of Wisconsin spoke to Brendan's demeanor after the officers told him that they were going to arrest, spoke to the fact that at that moment, the first thing he did was ask for his mother. At that moment, he began to weep. Why only then? That's the moment he understood. What bargain? That honesty and repeating back the story that the officers gave him would set him free. So there was a bargain? There was a bargain, Your Honor. Repeat back the story that we want to hear, and in exchange, you will be set free. It was a bargain that was understood as such because of Brendan Dassey's limitations, which is precisely what the Supreme Court was supposed to do to define coercion in terms of how a reasonable person in that suspect's position would have perceived. And that's because of his lower IQ. And his impairments, and his disabilities, and his age. Yes, Your Honor. And the fact that he is 95% more suggestible than the population. That's exactly right. Some people could have a psychological condition for any point that you're making. And in Gallegos and other cases, the Supreme Court has told us not to get too, if you will, siloed in our thinking about this. That Brendan is of lower intelligence or that he's this or he's that. He's a package. So I want to ask you whether you think the correct legal inquiry is whether a reasonable person, a reasonable functioning adult would have found this interrogation coercive, or if we're supposed to take all aspects of Brendan as an individual and ask that question. We are to take all aspects of Brendan's personal characteristics into account. And what's your best case for that? That this is not something that's just an objective standard? Yarborough v. Alvarado directs the litigants and the courts to examine the actual mindset of the suspect in a similar way to the objective Miranda custody inquiry. And this court has said in multiple cases, including U.S. v. Sturtevant, that the inquiry is whether a reasonable person in the defendant's shoes would have been coerced, which is of a piece with a longstanding line of Supreme Court case law. Haley v. Ohio would not exist if we were to judge all interrogation tactics against the will of an adult. Haley tells us the opposite. That which would leave a man cold and unimpressed can overawe and overwhelm a child. And that's what you see on this tape. So, Ms. Noeder, the police need to take account of all circumstances, right? The police rarely will have access to a full psychological background, school records, and all the information that's been used to challenge the voluntariness of this confession. They simply deal with the first witness and then later suspect that they're dealing with without all that background information. If we were to affirm the grant of habeas relief in this case, which you've described as unique, what practical advice would you give to police about what is and is not permissible in interrogating a high school boy who's not very quick? I would say, Your Honor, that taking this case as an example, these interrogators knew at the least that he was 16 years old. Based on their interactions on February 27th, they also had at least some reason to believe he might be limited. He wasn't able to spell agent or detective on February 27th. So what should they do? What can they do to solve the crime? They may still question him. There's no doubt about that. Can they bluff? They may, as long as it doesn't overbear his will. But they cannot say things that will land on this defendant as a promise. They should never say things like, I'm a cop, but I'm not right now. I'm a parent. When you've got a 16-year-old in the interrogation room. They shouldn't say things like, we know you're scared of arrest, but you've got nothing to worry about. Everything will be all right. You're creating new law now. There is no case that says that. And we're here on 2254D review. A federal court cannot create new law on habeas review. And that's what you're asking for in this case. It's just flatly impermissible under all the Supreme Court's precedents. Your Honor, I am not asking for the creation of new law. I am asking for this court to apply decades-old law. You're identifying criteria and things that the cops cannot do. There is no case that says they cannot do those things. I am not asking this court... Your case has to use this case to establish that new benchmark for investigators in interrogating juveniles. There is no case law to support that under established law under 2254D you must lose. Let me be very, very clear. I am not asking for this court to erect a rule that anything the officers said will always be proscribed going forward. Aren't you focusing... That's why I want to come back to 2254D2 because that's a very factually bound circumstance and it's the decision based on all of the evidence that with this package of facts the finding that this was a voluntary confession was not even a possible finding on this record. That doesn't create new law. The Supreme Court just now in Brumfield two years ago to be accurate, 2015 says that the 2254D inquiry asks you to look at an unreasonable determination of the facts. Isn't that what you're following? That is exactly what we're following, Your Honor. This is a very fact-bound case and there was an unreasonable determination in the facts in this case. And I would also imagine that the facts in this case are unlikely to recur. Which fact finding do you take issue with? I take issue with the state court's finding that there were no promises of leniency made to this defendant which is what the district court identified as a D2 error. Well, that's asking for new law because you're asking for us to hold that this biblical quote is beyond the pale and no reasonable judge could disagree with that. That is asking for new law by definition because no court says that. I am asking for this court to apply Miller v. Fenton. Both the state courts, though, the trial court and the appellate court specifically acknowledge the statement, the general, you know, the truth, honesty will set you free. They both acknowledge that point, right? They did, Your Honor. So, obviously, didn't think that was a sufficiently specific or legally relevant promise of leniency. Is that a fair reading of what they said? Yes, and that's the unreasonable application of law  reading of the law. Is that fact or law? Well, Your Honor, the district court treated it as a D2 fact following Sharp versus Rowling in the Tenth Circuit which did the same thing. But whether it's treated under D2 or D1, I think we are left with the ultimate conclusion being the same. Isn't the D, as I see it anyway, maybe this is too literal, the D1 aspect of this is whether in the end this was a voluntary confession. The Supreme Court has said that that question raises a question of law because it's a constitutional fact sort of, but it's assessed as a matter of law. The D2 question is the more granular one. Looking at all of these transcripts, are there one or more promises of leniency? Should you look at this this way? And the court has said as far back as the Terry Williams against Taylor case that the facts don't need to be an exact map. You're going to look at these promises and see whether they actually amount to a promise of lenience. That's exactly right, Your Honor, and the court has reiterated that more recently in Panetti versus Quarterman and Marshall versus Rogers. Clearly established federal law may be found in general principles. We need not identify a case with factual identity at a high level of specificity. So another case could come along when somebody would say you shall know the truth and the truth shall make you free and that would not be a promise of lenience. I would imagine for most people that would not be a promise of leniency. That's correct. Exactly right. So there's no automatic character to the rule if it's a D2 problem. Was this a promise or was this not a promise? There is no automatic character. We must not evaluate these tactics in isolation. The Supreme Court directs us to do otherwise. They must be evaluated in conjunction with the package of Brendan Dassey's vulnerabilities. The Supreme Court here has instructed us to consider Brendan Dassey's reaction to this promise in part as a part of the consideration here when it directed us in Yarborough versus Alvarado to turn to the actual mindset of the suspect. That's why the moment when Brendan Dassey asks to go back to school is so powerful. It speaks to his understanding of the bargain that has been struck. So I would like your response to the points Mr. Burke was making about facts that Dassey furnished that were not fed to him by the police officers or the media. Indeed, Your Honor, most of the facts that were listed in the panel dissenting opinion were in fact fed to him often on February 27th. The whole notion that a rape was involved at all in this crime was fed on February 27th when the officers asked Brendan did he try to have sex with her or anything and she said no. It's very important we had heard that he might have told you that. The notion that Brendan had participated in burning the body also on February 27th. Brendan, I'm going to ask you a difficult question, okay? Did you help him  in the fire? If you did, it's okay. Seeing body parts in the fire, this is a telling moment on February 27th when the officers tell him, Brendan, I find it very hard to believe that you didn't see something in that fire. A hand, a foot, a head, something in that fire and then he repeats back those same body parts. Fingers, toes, and a forehead that he saw in the fire. The smell was fed to him on March 1st. We talked Monday night about bad smells and stuff. Do you remember any smells coming from that fire after she was put on there? Going inside. Was the fire had tires in it too? I'm sorry? Did this fire included tires? It did. Which don't smell that great when they burn either. It did. The notion that he went inside Avery's trailer. Be honest, you went inside, didn't you? Hallbach's words, even her words during this supposed rape were fed to Brendan Dassey. Was she saying anything while you were doing this? Did she ask you not to do this to her? And Brendan says, she told me not to do it. Tying Teresa Hallbach up. You helped to tie her up though, didn't you Brendan? Because he couldn't tie her up alone. There's no way. On and on and on these facts were fed. A few of these... So what about the ones that were supposedly not fed that your opponent mentioned? Well, the majority, the vast majority of this confession was fed to him. But even if it's only a few, that would be worth attending to. The state court might think. There were moments when the investigators after steering Brendan down a path allowed him to offer a story without fact feeding. And at that moment you can see him drawing on various sources for these details. Often what he drew on was details that had been circulated in the media. For example, her blood being found in the back of the RAV4. That's the detail that he knows was the case. And that explains his initial story that he had seen her in the back of the RAV4. He also draws on the book Kiss the Girls at times. A book that includes hair cutting of a rape victim. That's where that part of that story comes from. And a few... Do we know the... I find at least some interesting tension between this theory. Do we know the, for example, the level of writing and comprehensibility of that book? Your Honor, that is an interesting thing. But the IQ... Or how closely he followed the media reports so as to remember every detail. This man with, this boy with limited intelligence. Both of those things are in the record, Your Honor. The IQ tests that Brendan was given repeatedly over time demonstrate that his limitations are primarily with respect to oral communication, verbal communication. But he can read and comprehend at a much higher level this was a consistent result over time. And as for his exposure to the media reports, there was testimony at post-conviction from Brendan's mother, Barb, that the family regularly had the TV on. And of course the story that was being told on the news was the story of their relative Stephen Avery's arrest. The family was closely following this and why wouldn't they? Not only did it implicate their family member, but it implicated their home and their livelihood. That's where he got some of these additional pieces of information from. The State of Wisconsin views this confession as corroborated, but in fact the corroboration on which it hangs its hat was a product also of the fact-feeding that occurred during this interrogation. They point to the bullet found in the garage, but it was the interrogators themselves who took Brendan Dassey into that garage, originally he had the shooting occurring outside the garage near the bonfire pit and it is them who say, Brendan, we need to get the accuracy about the garage. Why do they think it happened in the garage? Because they had  shell casings in that garage. The motive of the police was to get a second killer? I'm sorry, Your Honor? What was the motive of the police in doing this? Get a second killer? Your Honor, the test does not direct us. No, I know that's not the test. That's the question I'm asking you. The record doesn't speak to the motive of the police in this case. You're arguing their motive. I am not, Your Honor. In fact, the district court here in granting relief pointed out that the police may well have simply failed to appreciate the way in which their words landed on Brendan Dassey and that may well be the case in this case, but it does not preclude relief. In fact, it still bolsters relief under the principles of Miller v. Trenton. So they needed two killers? No, Your Honor. They needed the truth, but the problem with this interrogation is that the way in which they pressured and pursued Brendan Dassey was in direct contravention of the seeking of the truth. That's the problem here. They may have failed to appreciate it at the time, but that is not the relevant inquiry. Can we shift just a minute to Sullivan and Mickens and why you believe that they clearly established that there was prejudice and that counsel was conflicted in a manner other than a concurrent co-representation of clients? Well, Your Honor, I believe that Mickens does not bar relief in this case for two reasons. First of all, the nature of the conflict exhibited by Mr. Kaczynski can well be understood as a concurrent representation conflict similar to the one at play in Kyler v. Sullivan. True, it doesn't involve co-defendants, but it involves something more egregious, working for the state at the same time as working for one's client. But under D-2, we know that the court need not identify clearly established federal law in order to grant relief. And there was a clear D-2 error in the state court's adjudication of the ineffective assistance of counsel claim. So once that D-2 threshold has been crossed, the court is then free under 2254A to apply Kyler v. Sullivan, notwithstanding Mickens. When were the shell casings found? In November of 2005. In the garage? In the garage, Your Honor. And how much, if anything, did the investigators know about his intellectual or emotional limitations? Well, Your Honor, they had a couple of tips on February 27th. Of course they didn't have access to his full psychological workup, but they did know on February 27th that this was a 16-year-old 10th grader who couldn't spell the word agent, who couldn't spell the word detective, and on March 1st this was further confirmed when he couldn't spell rack or garage for them. These were cues that something was going on here. They also had cues on March 1st. The spellings of those words should tip them off there's some problem? They gave them at least some reason to suspect that there might be limitations here and an additional reason to take special care in the questioning of Brendan Dassey. They still had a great deal of freedom in the questioning of Brendan Dassey, but they should not have said things that would have landed on someone of Brendan's age and limitations as a promise. And what else besides the misspelling? They knew that he was 16 years old, Your Honor, and in the 10th grade they picked him up twice from his school and had had previous interactions with a school counselor at which they could well have asked for Brendan Dassey's records, his extensive IEPs and other special education records. But they had enough information to know that he was limited and especially on March 1st they should have known when they asked Brendan Dassey to produce the one piece of non-public information about this crime that the true perpetrator should have known that she was shot in the head and he responded by guessing with all these various different theories about how the murder happened trying to inculpate himself in a murder but not knowing how to describe the murder he supposedly committed. So they knew he was a sophomore, they knew he was 16. Did they ask him about any special services he might be receiving? Your Honor, the record does not reflect them asking what might have been a very simple question. Are you in regular classes or special educational classes? And the answer would have been there were a lot of regular classes. There were some special ed classes. That's right, he was receiving special education support services. He had three IEPs. Exactly right. And I guess the IEPs were there was a supplemental filing about the fact that they were in the district court but not here. Is that right? There was a supplemental filing after the argument last time because I had incorrectly answered Judge Williams' questions about whether there were an IEP in this case. I had said no and then realized after the fact that I was wrong there in fact are three IEPs in the state court record which is what that supplemental filing was directed towards. So is it your position that with the misspellings that that should have prompted them to ask if he was getting any special education services? That certainly could have been one thing that they did, Your Honor. I don't think it is required as things currently stand but prospectively moving forward that certainly is something that an interrogator in these officers' position might do to avoid it. Do we know if interrogators are trained for tactics for people with limitations? I mean you and I can sit here and say well of course people with higher functioning are better able to deal with the abstract. People with lesser functioning or you know maybe a child you need to be more concrete but do we know that the police had any idea what they were supposed to be doing if they had known the things that you're talking about? Well, Your Honor, the record doesn't speak to the type of training that these officers received. The record does include amicus brief by one of the leading interrogation training firms with Glenda Zulawski which uses this interrogation video to train police officers how not to interrogate children. So I would guess though that maybe the real question is whether that's relevant at all because if the ultimate question under the Supreme Court's precedent is whether the confession was voluntary, that's from Brendan's point of view. It's not from the police officer's point of view. I think that's exactly right, Your Honor. The test directs us to look at the tactics used and weigh them against the individual suspect's characteristics. Even if the tactics had been perfect, if you had evidence to show that the person who was being interrogated gave an involuntary confession, that would be enough to suppress it. Well, I think that's right. Subject to Colorado versus Connolly is requirement of police coercion. I think that's correct, Your Honor. So coercion and voluntariness are somewhat different concepts. Coercion, as the Connolly court has told us, must first be shown in order to reach the conclusion of involuntariness. But that coercion must then be weighed against an individual defendant's ability to resist. And, as Miller-Fenton tells us, coercion itself must be defined with reference to a particular defendant's vulnerabilities. If this court does not measure the words said to Brendan by Brendan's ability to withstand them, then Miller versus Fenton has no meaning when it tells us that the voluntariness inquiry applies equally to cases in which the tactics are coercive only as applied to the unique characteristics of the defendant. So why isn't that a completely subjective test that you say in your answer to the petition for hearing you're not advocating? Well, Your Honor, the Supreme Court has not spoken using the terms objective or subjective in this particular arena, but we know, for example, to draw an analogy,  versus North Carolina, the court has said that it is quite feasible for state courts to take into account a child's age without doing damage to the child. Without doing damage to the nature of the custody analysis. Without doing damage to the objective nature of that analysis. We also know that this court, in cases including U.S. v. Sturdivant, has said that voluntariness must be evaluated from the position of a reasonable person   you're looking at page 116, I think, of Miller, where the court says that it is not a matter of objective or subjective analysis but rather that the court says consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statements as applied to this in italics by the court suspect are compatible with the system that presumes innocence, etc. That's exactly right and it's reiterated also at page 109-10. That's exactly right. I think you're about to run out of time if you would like to wrap up. All right. If there are no further questions at this time, I would ask this court to affirm the District Court's grant of habeas relief. All right. Thank you very much. Mr. Byrd, how much time does he have? Five minutes as you reserved. Investigators warn Dassey specifically. We can't make any promises very early on. The Miranda warnings warn Dassey. Anything you say can be used against you. That statement that we were talking about earlier, honesty will set you free. That came right after the officers warned Dassey. We can't make you any promises. So do people never say contradictory things in interrogations? A consistent... That seems like an extreme point. A consistent theme to Dassey was... So you agree that they could have said we're not making any promises and then they could have turned around five minutes later and made a promise. Of course they could have. Right. So the question is did they, not could it have happened? They didn't because that statement re-invoked the theme that he needed to get it off his chest. That the only way that he was going to be free of the images in his mind, the video in his head, they used that language. Which they have assumed is all... They assume that this video in his mind is there. They assume that he knows all of these things and I guess I'm not really at rest about what he actually knows that they don't tell him, Brendan we already know all of this, how about the gun, how about the this, how about the that. The point is that they made very clear that they couldn't make any promises and the point I'm trying to make is that the idiom was just re-invoking a theme which was you should get these things out of your mind, you should get them off of your chest. They said that repeatedly in the first interview. So there's no way he would have interpreted that as a promise. In any event, we're on habeas here. This is now the sixth time that a court has reviewed this case in a decade. Hundreds of pages have been written. A number of courts have found that there's a real problem with this. You've got the district court, magistrate judge and you've got the panel in this case. So I don't know that this is a slam dunk. And when we look at the language that was used when he... I mean in terms of saying they're fathers, they say we're cops, we're investigators and stuff like that. But I'm not right now. I'm a father that has a kid your age too. There's nothing I'd like more than to come over and give you a hug because I know you're hurting. Talk about it. I promise I will not leave you high and dry. And other things that they say suggesting that all he has to do is tell them and then everything will be all right. In all of the filings and all of the opinions, you will not find a single case, not one. Not from the Supreme Court, not from a federal court, not from a state court, not on de novo review, not on habeas review. You will not find one case. Finding a confession involuntary in circumstances similar to this. All of the cases that we have that are even remotely close to this case go exactly the same way. Courts have consistently held that minor lies about what they know is not coercive. They've held that vague assurances are not coercive. Fatherly manner is not coercive. Courts have consistently held that. All of that may be true, but the question is the recipient. We're trying to figure out when they know that this is a 16-year-old at a minimum, whether saying those things, you know, if I were to say things to my 4-year-old grandson, you know, he's not going to understand it the way you would, or at least I hope that maybe you've moved a bit beyond my wonderful grandson, William. But, you know, you say things to an adult that are not the same as you would say things to a younger person. Absolutely. And so the fact that there may be cases where adult defendants have heard things that are these  doesn't tell you whether saying them to a child is coercive. Absolutely. But the two closest analogs... I'll send them to your room for the rest of your life. You're being so annoying today. And, you know, maybe the kid thinks you're really going to send him to his room for the rest of his life. The two closest cases we have are Fair v. Michael C. and Etherly. Fair involved a 16-year-old. The officer said things that are nearly identical to what the investigator said here. And the Supreme Court held that they were far from threatening or coercive. In Etherly, you have a 15-year-old who was less... But surely they would look at each case. The Supreme Court never said we are making this ruling for all time. We need to look at exactly what was said in each case and exactly to whom. Absolutely. That's right. It's a totality test. Right. And it doesn't rule out limitations of the individual. But totality tests are broad. They're open-ended. And so there's more room for disagreement. This Court and the Supreme Court have consistently said that for broad, open-ended tests, state courts have even more leeway. So you don't need a case that's exactly on point. Sure. But you need one that's very close. It has to be clear beyond reasonable dispute, such that no fair-minded jurists could disagree. The Supreme Court has used a lot of different words to express this concept to say it's got to be very close. All right. I see your yellow and now your red piece of paper. So if you'd like to wrap up in one sentence, you may do so. The whole point of AEDPA is to prevent the second guessing of juries and state courts a decade later. The District Court and the panel majority did exactly that. Please reverse. All right. Thank you. Thank you as well to counsel for Mr. Dassey. The court will take the case under advisement. We have recess. Are we in recess? We're in recess.                  the first reading of the first part of the AEDPA written by Ms. M. B. Donovan. We have a motion to approve the first reading the second reading    Ms. M. B.